[Cite as *In re K.M.*, 2019-Ohio-1833.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| K.M. | : | CASE NO. CA2019-01-015 |
| | : | O P I N I O N<br>5/13/2019 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2017-0066

Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Jeannine C. Barbeau, P.O. Box 42324, Cincinnati, Ohio 45242, for appellant

Nicole M. Stephenson, 10 Journal Square, Suite 300, Hamilton, Ohio 45011, guardian ad litem

**S. POWELL, J.**

{¶ 1} Appellant, the father of K.M. ("Father"), appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of his daughter to appellee, Butler County Children Services ("BCCS"). For the reasons outlined below, we affirm the juvenile court's decision.

**The Parties**

{¶ 2} The child at issue in this case, K.M. was born on October 25, 2013. Father submitted to a paternity test shortly after K.M.'s birth that proved he was the child's biological father. K.M. is one of Father's nine total children. Father and K.M.'s mother ("Mother") were never married. Mother, who has five other children besides K.M., is not a part of this appeal. The record indicates Father, although a part of this appeal, has had very little contact with K.M. following her birth. Father's absence from K.M.'s life appears to be the indirect result of Father serving eight years in prison after he was convicted of raping a thirteen-year-old child and thereafter failing to report a change of address due to his status as a registered sex offender.

**Complaint, Adjudication, and Disposition**

{¶ 3} On February 16, 2017, BCCS filed a complaint moving the juvenile court for temporary custody of K.M. The complaint was based on allegations that K.M. was a dependent child. In support of its complaint, BCCS alleged it had received reports regarding Mother's inability to care for her six children due to issues regarding "truancy, poor conditions of the home, and lack of food in the home." BCCS also alleged that it had received a report that Mother had recently placed her eight-month old daughter, A.M., with a family friend. Father is identified as K.M.'s father on the complaint with his current whereabouts listed as "unknown."

{¶ 4} Upon receiving these reports, BCCS alleged that Mother entered into a home safety plan that placed Mother's five other children, including A.M., with a different family friend. The children were placed with this family friend after BCCS conducted a background check and walk-through of the family friend's home. But, shortly after being placed in the care of this family friend, BCCS alleged three of the children, including K.M., were removed from her care after the children were found by police alone and unsupervised in the family

friend's car parked in a Wal-Mart parking lot. The complaint indicates the family friend was subsequently charged with child endangerment resulting from this incident.

{¶ 5} After being removed from the care of this family friend, BCCS alleged the children were then placed with the family friend's adult son and his wife. But three days later, BCCS alleged it received a telephone call wherein it was reported that they too could no longer care for the children, including K.M. Because there were no other viable placement options for K.M., BCCS concluded its complaint by requesting that K.M. be placed in its temporary custody. After receiving BCCS's complaint, the juvenile court granted emergency temporary custody to BCCS and appointed K.M. a guardian ad litem. A Court Appointed Special Advocate was also assigned to the case.

{¶ 6} On May 11, 2017, the juvenile court adjudicated K.M. a dependent child. Upon making its adjudicatory decision, the juvenile court issued an entry that noted "Mother is not yet participating in case plan services" and that Mother was visiting K.M. "irregularly." The juvenile court also noted that Father's whereabouts were still "unknown." The record, however, indicates service on Father was perfected through publication. But, while Father was only served by publication, the record indicates Mother informed Father that K.M. had been removed from her care and placed in the emergency temporary custody of BCCS.

{¶ 7} On June 20, 2017, the juvenile court issued a dispositional decision granting temporary custody of K.M. to BCCS. The juvenile court also adopted a case plan that required Mother to engage in a number of case plan services. Despite both purportedly having knowledge of the hearing, the juvenile court found Mother and Father in default when neither appeared at the dispositional hearing. The juvenile court also found Mother had abandoned K.M. The juvenile court based its decision upon a finding that Mother had virtually no contact with K.M. after the child was removed from her care.

{¶ 8} On January 5, 2018, the juvenile court held an annual review hearing. The

record does not contain a transcript this hearing. However, the juvenile court's entry issued following this hearing includes a note that Father appeared at the hearing pro se. The juvenile court's entry also noted that BCCS was to "arrange for [Father] to visit with [K.M.] once he has commenced participation on case plan services." Due to the lack of transcript, the record is devoid of any evidence indicating Father made any objections or presented any challenge to the juvenile court's personal jurisdiction over his person at this hearing.

{¶ 9} There is conflicting evidence as to how Father became aware of the juvenile court's annual review hearing. While the guardian ad litem noted in her report and recommendation that Father had contacted BCCS, Father claimed that it was BCCS that had contacted him. There is no dispute, however, that Father waited several months to intervene in the proceedings before the juvenile court despite having received notice that K.M. was in foster care. As Father explained to the juvenile court at a subsequent review hearing:

> Your Honor, when you have a background such as I have, made a choice and then put a title on, you know, I'm used to feeling like the justice system is against me. At that time, yeah, I knew by the mother of my child, [Mother], what had happened. I feared, you know, my home background, I didn't stand a chance, period. That's how I felt. I felt defenseless. So I was hoping, you know… I felt like [Mother] had more of a chance to get our kid than I did.

{¶ 10} Continuing, Father stated:

> I wouldn't have known nothing about even having a chance if it wasn't for [a former caseworker] calling me and telling me that I need to find somebody on my daughter's behalf to fight for her. I never received paperwork. I never received anything, you know. So that's where the late start comes from. To understand that, you would have to understand my position, you know, it's no excuse none of that.

{¶ 11} Concluding, Father stated:

> It's just that when you've been in the system and been looked at as a certain way, you feel defenseless in a lot of situations. * *

- 4 -

* And so when the caseworker called me and kind of gave me a chance to get my own daughter, I did what I had to do, you know, step up, because without that call I wouldn't have felt like I had any chance.

{¶ 12} On January 25, 2018, the guardian ad litem moved the juvenile court to "suspend" Father's supervised visitation time with K.M. Following an ex parte hearing on the matter, the juvenile court issued an emergency order granting the guardian ad litem's motion. In so holding, the juvenile court found Father's visitation time with K.M. should be indefinitely suspended after a background check uncovered Father's rape conviction and status as a registered sex offender. Due to Father's status as a registered sex offender, the juvenile court suspended Father's supervised visitation time "until he has completed a sex offender assessment," becomes "actively involved in case plan services," and "until [K.M.'s] therapist is able to meet with her to address any issues related to reinitiating contact with her father."

{¶ 13} On January 29, 2018, the juvenile court held a hearing to address the previously issued emergency order. Father appeared at this hearing with counsel. Father, although now with the benefit of counsel, still did not object or make any challenge to the juvenile court's jurisdiction over his person. The record instead indicates Father submitted to the juvenile court's jurisdiction and agreed that he needed to "submit to a sex offender assessment and follow through with those recommendations" before he could have any visitation time with K.M. It is undisputed that Father never completed the required sex offender assessment. It is also undisputed that Father at that time had not had any contact with K.M. for more than two years.

**Motion for Permanent Custody and Permanent Custody Hearing**

{¶ 14} On May 31, 2018, BCCS moved for permanent custody of K.M. In support of its motion, BCCS alleged that granting permanent custody would be in K.M.'s best interest

since neither Mother nor Father could provide adequate parental care for the child. Several months later, on September 21, 2018, Father moved the juvenile court for custody of K.M. Father alternatively moved the juvenile court to grant custody to the child's paternal aunt ("Aunt") and uncle ("Uncle"). A two-day hearing on the permanent custody motion was held on October 8 and October 9, 2018 before a juvenile court magistrate. The following is a summary of the testimony and evidence presented at the permanent custody hearing.

### Caseworker's Testimony

{¶ 15} The caseworker assigned to K.M.'s case initially testified. The caseworker testified the case regarding K.M. was opened after BCCS received a report that there were "issues" with the family home, a lack of food in the home, and allegations of truancy for Mother's school-aged children. A subsequent investigation substantiated those reports. Upon confirming the reports as true, the caseworker testified that K.M. was removed from Mother's care and ultimately placed in a foster home with her younger sister, A.M. It is undisputed that K.M. and A.M. have stayed in that same foster home ever since their initial placement in that home.

{¶ 16} Continuing, the caseworker testified that K.M. "does great" in her foster home and "seems very well-adjusted to the home." The caseworker also testified that K.M. "does well and has a very good bond with her foster parents and her sister in the home." This is because, as the caseworker testified, "[i]t just seems like her home. If she needs something, she goes up to her foster parents for help, and just goes up to them and gives them hugs, and just very positive interactions." Having already started the adoption process for A.M., the caseworker further testified that K.M.'s foster parents had informed her that they would also be interested in adopting K.M. if permanent custody was awarded to BCCS.

{¶ 17} On the other hand, as it relates to Father, the caseworker testified she was unaware when Father last had any contact with K.M., but that Father had reported to her

that "it was prior to the removal, maybe in December of 2016." The caseworker also testified that Father had not had any visitation time with K.M. after the child was removed from Mother's care. The caseworker further testified that Father had not completed many of the required case plan services. This includes Father failing to complete the necessary mental health and substance abuse treatment due to poor attendance that led to his unsuccessful discharge from the treatment program. The caseworker testified Father also failed to complete the required sex offender assessment needed in order to commence any visitation time with K.M.

{¶ 18} Next, when asked if BCCS had found any relatives willing to take care of K.M., the caseworker testified that Aunt and Uncle were considered as a potential placement for the child. K.M., however, had not had any relationship with Aunt and Uncle prior to her removal from Mother's care. Aunt and Uncle were nevertheless granted supervised visitation time with K.M. Although they initially had bi-weekly two-hour visits, at Aunt's request visitation time was modified to weekly one-hour visits. But, due to lack of attendance, the caseworker testified Aunt and Uncle's visitation time was subsequently suspended. As the caseworker testified:

> Q: Do you know why visitation stopped?
>
> A: There was a visit that [Aunt] contacted me to cancel, so I let the visitation center know what that visit would be cancelled, and then the visit the following week [they] no-showed to the visit. So [the visitation center] policy is if you miss two (2) visits within a thirty (30) day period that visits are taken… the family is taken off the schedule until they can meet with a supervisor to address the attendance issues.
>
> Q: Now did you reach out to [them] to see what was going on with the visitation?
>
> A: Yes.
>
> Q: Did you ever receive any notification back from them?

No. I left a voicemail and then didn't hear back.

The caseworker also testified that Aunt and Uncle were often late for their one-hour visits with K.M. This includes three of their one-hour visits where Aunt and Uncle were seven, eight, and 14 minutes late, respectively. The record confirms the caseworker's testimony.

Court Appointed Special Advocate's Testimony

{¶ 19} The Court Appointed Special Advocate assigned to the case then testified. The special advocate testified that she had met with K.M. nearly 60 times during the pendency of the case. During these visits, the special advocate testified she observed K.M. to be a "delightful little girl" who is "inquisitive, energetic, and very loving." The special advocate also testified that K.M. was "absolutely" bonded to her foster family and that she is "just part of the group." Specifically, as the special advocate testified regarding K.M.'s interactions with her foster family:

> The affection goes both ways, for sure, and it's very… very demonstrable when you're at the visits. There's a lot of hugging going on. If there's any… any question, she knows who to run to for an answer.

The special advocate further testified that K.M. was "thriving" in her foster home under the care of her foster parents.

{¶ 20} To the contrary, as it relates to Aunt and Uncle, the special advocate testified she had observed them during their visitation time with K.M. but that "most of the visits were [just] eating and playing." And, rather than demonstrating a bond, the special advocate testified K.M.'s relationship with Aunt and Uncle appeared to be in the nature of just of an "acquaintance." Specifically, as the special advocate testified, "[K.M.] did not seem to have any thought about what the visits were really all about except for eating and playing."

{¶ 21} The special advocate further testified that K.M. did not appear to recognize Aunt and Uncle at their first visit and that K.M. had to be introduced to Aunt and Uncle at

that initial visit. The record indicates K.M. also declined to take a picture of herself with Aunt and Uncle to her foster home and that K.M. had no difficulty in separating from Aunt and Uncle when their visitation time is over.

## Father's Testimony

{¶ 22} Father was the next witness to testify. Father testified he was currently living in an apartment with his niece. As for employment, Father testified he was unemployed but that he was waiting on a background check in hopes of being hired as a janitor. Father also testified he has no income, no car, and no driver's license. Father further acknowledged he had not seen K.M. for at least two-and-one-half years, that he had failed to complete most of the required case plan services, that he had spent several years in prison for raping a thirteen-year-old child, and that he would then test positive for marijuana if required to submit to a drug screen. The record indicates Father was also in arrears on his child support obligations. Father nevertheless testified that he wanted to obtain custody of K.M. or have custody granted to Aunt and Uncle. This was because, as Father testified, "[t]he only concern I have is her growing up and not knowing the truth, who her real family is, who her father is."

## Aunt's Testimony

{¶ 23} Aunt was the final witness to testify. Aunt, who works full-time as a nursing assistant, testified she wanted to obtain custody of K.M., that she enjoyed spending time with K.M., that she loved K.M., and that K.M. referred to her as "Auntie." Aunt also testified that she "loved" spending time with K.M. during her and Uncle's supervised visitation time and that those visits "went pretty well." But, after missing two visits, Aunt acknowledged that her and Uncle's visitation time was suspended. Aunt, by her own admission, did not take any affirmative steps to have that visitation time reinstated. Aunt instead testified she believed that once the caseworker "told [her] they were cancelled, they were cancelled. * *

* Cancelled means cancelled."

{¶ 24} Continuing, Aunt testified she thought it was in K.M.'s best interest for her and Uncle be granted custody of the child. This was because, according to Aunt, "I feel like she needs to be with family." Aunt further testified:

> I feel like that I can… I know for a fact that I can give her the love that she needs, the attention that she needs. I can provide her with food and clothes and everything else too, plus she'll be around family, extended family.

Aunt, however, readily admitted that she had not met K.M. before she and Uncle were granted supervised visitation time with the child.

{¶ 25} Concluding, when asked if she had any concerns about taking K.M. out of her foster home due to her significant bond to her foster family, Aunt testified:

> It really [doesn't concern me]. At this age, this would be the time. If we wait any longer, it could really mess with her, I feel like, mentally. She's at the age where she can, you know, forget or learn new.

### Juvenile Court's Decision

{¶ 26} On October 15, 2018, the magistrate issued a decision finding it was in K.M.'s best interest to grant BCCS's motion for permanent custody rather than granting legal custody to either Father or to Aunt and Uncle. Shortly thereafter, on October 24, 2018, Father filed objections to the magistrate's decision. In support, Father argued the magistrate's decision was not supported by clear and convincing evidence. Father also argued the magistrate's decision was not in K.M.'s best interest. But, after holding a hearing on the matter, and upon reviewing the complete record, the juvenile court overruled Father's objections and affirmed and adopted the magistrate's decision in its entirety.[1] In so holding, the juvenile court stated that it had "never seen a case that * * * was more clear cut." The

---

1. We note that Father did not appear at the juvenile court's objection hearing. We also note that Father's counsel stated at that hearing that he was unaware of where Father was then residing.

juvenile court also found that "there's no other dispositional order I could make that's better, and better for [K.M.] and her best interest."

**Appeal**

{¶ 27} Father now appeals from the juvenile court's decision granting BCCS's motion for permanent custody, raising three assignments of error for review.

{¶ 28} Assignment of Error No. 1:

{¶ 29} THE JUDGMENT OF THE TRIAL COURT IS VOID AS THE TRIAL COURT LACKED JURISDICTION AS TO FATHER TO TERMINATE HIS PARENTAL RIGHTS.

{¶ 30} In his first assignment of error, Father argues the juvenile court's decision granting BCCS's motion for permanent custody is void due to a lack of personal jurisdiction. In support, Father claims BCCS failed to exercise due diligence to identify and locate him. This failure, according to Father, prohibits the juvenile court from now exercising jurisdiction over his person and renders the juvenile court's decision granting BCCS's motion for permanent custody void. We disagree

{¶ 31} "'It is rudimentary that in order to render a valid personal judgment, a court must have personal jurisdiction over the defendant.'" *In re S.S.*, 9th Dist. Wayne No. 10CA0010, 2010-Ohio-6374, ¶ 43, quoting *Maryhew v. Yova*, 11 Ohio St.3d 154, 156 (1984). "Personal jurisdiction describes a court's authority over particular litigants in a specific case, and 'may be acquired either by service of process upon the defendant or the voluntary appearance and submission of the defendant to the jurisdiction of the court.'" *In re B.M.,* 4th Dist. Hocking No. 16CA12, 2017-Ohio-7878, ¶ 8, quoting *Snyder Computer Sys., Inc. v. Stives*, 175 Ohio App. 3d 653, 2008-Ohio-1192, ¶ 14 (7th Dist.).

{¶ 32} Contrary to Father's claims, the record indicates service on Father was perfected by publication. The record also indicates Father was notified of the proceedings and participated fully in those proceedings without ever raising any challenge to the juvenile

- 11 -

court's personal jurisdiction over him. This includes Father appearing at the juvenile court's annual review hearing, Father being added to the case plan, and Father testifying at the permanent custody hearing. "An objection to personal jurisdiction is waived by a party's failure to assert a challenge to such jurisdiction at its first appearance in the case." *In re A.L.W.*, 11th Dist. Portage Nos. 2011-P-0050 thru 2011-P-0052, ¶ 37, citing *McBride v. Coble Express, Inc.*, 92 Ohio App.3d 505, 510 (3d Dist.1993). The record is devoid of any evidence indicating Father asserted such a challenge in this case.

{¶ 33} By initially failing to challenge the juvenile court's jurisdiction over his person, or anytime thereafter, Father forfeited any such challenge on appeal. *In re P.O.*, 11th Dist. Geauga No. 2015-G-0028, 2015-Ohio-4774, ¶ 23 (by failing to challenge a juvenile court's jurisdiction over appellant's person in a permanent custody proceeding appellant "forfeited any such challenge on appeal"); *In re G.D.*, 9th Dist. Summit NO. 27855, 2015-Ohio-4669, ¶ 19 (challenge to personal jurisdiction waived in a permanent custody proceeding where appellant's trial counsel "did not object to service, appeared at the permanent custody hearing, and fully participated in the hearing in regard to both children"). This is true even if service on Father was not perfected by publication. Therefore, because the juvenile court properly exercised jurisdiction over Father's person, Father's first assignment lacks merit and is overruled.

{¶ 34} Assignment of Error No. 2:

{¶ 35} TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO BUTLER COUNTY CHILDREN SERVICES WHEN APPROPRIATE RELATIVES WERE WILLING AND ABLE TO PROVIDE A PERMANENT, LEGALLY SECURE HOME FOR K.M., HAD AN APPROVED HOME STUDY, AND HAD ATTENDED REGULAR VISITATION TO THE EXTENT ALLOWED BY THE AGENCY, AND FATHER WAS IN FAVOR OF THE PLACEMENT WITH HIS CHILD.

{¶ 36} In his second assignment of error, Father argues the juvenile court erred by granting BCCS's motion for permanent custody rather than granting legal custody to Aunt and Uncle. We again disagree.

{¶ 37} Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated an abused, neglected, or dependent child, the juvenile court may award custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]" But, although statutorily permissible, a juvenile court may award custody to a nonparent only "upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 13. A preponderance of the evidence is evidence that is of a greater weight or more convincing than the evidence which is in opposition to it. *In re L.A.B.*, 12th Dist. Fayette No. CA2012-03-008, 2012-Ohio-5010, ¶ 12.

{¶ 38} In order to determine the best interest of a child in a legal custody proceeding, the juvenile court is required to consider all relevant factors listed under R.C. 3109.04(F). *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 53. These factors include, but are not limited to, (1) the wishes of the child's parents regarding the child's care; (2) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (3) the child's adjustment to the child's home, school, and community; and, (4) the mental and physical health of all persons involved. R.C. 3109.04(F)(1)(a), (c), (d), and (e). An appellate court reviews a juvenile court's legal custody determination for an abuse of discretion. *In re M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 19.

{¶ 39} Father argues the juvenile court's decision must be reversed because BCCS "failed to show reasonable efforts to seek an alternative to permanent custody here." In

support, Father argues BCCS did not "seriously consider" placing K.M. with Aunt and Uncle. Father also argues Aunt and Uncle were "were not given a legitimate chance to get custody of K.M." Therefore, according to Father, when considering BCCS's "passivity and premature statements" by the guardian ad litem and Court Appointed Special Advocate indicating their support for granting BCCS's motion for permanent custody, it is clear that BCCS was "unwilling to seriously consider" Aunt and Uncle as "suitable relatives for placement" of K.M. We find no merit to Father's claims.

{¶ 40} Despite Father's claims to the contrary, the record indicates BCCS did make reasonable efforts in determining whether Aunt and Uncle were a suitable alternative placement for K.M. This includes BCCS conducting a home study and providing Aunt and Uncle with supervised visitation time with the child. But, even when receiving the benefit of those reasonable efforts by BCCS, the juvenile court found it was not in K.M.'s best interest to be removed from her foster home and placed with Aunt and Uncle. This is because, according to the juvenile court, such placement "would possibly, if not probably, be traumatic for [K.M.]" When considering K.M. had lived in that same foster home with her younger sister, A.M., for nearly one-third of her young life, we agree with the juvenile court's findings. This is particularly true here when taking into account the fact that K.M. was already receiving trauma-informed therapy.

{¶ 41} The record indicates Aunt and Uncle acted appropriately and lovingly in their interactions with K.M. But, as the special advocate testified, K.M.'s relationship with Aunt and Uncle appeared to be in the nature of just of an "acquaintance." On the other hand, the record indicates K.M. was strongly bonded with both A.M. and her foster family. This includes K.M. calling her foster parents "Mommy" and "Daddy" and referring to her foster home as "her" home. When considering K.M. was thriving in her foster home, the juvenile court found it would not be in K.M.'s best interest to "gamble" with her life by removing her

from her foster home and placing her with Aunt and Uncle. We agree. Therefore, when placing K.M.'s best interest at the forefront, the juvenile court did not err by granting BCCS's motion for permanent custody rather than granting legal custody to Aunt and Uncle. Accordingly, finding no error in the juvenile court's decision, Father's second assignment of error lacks merit and is overruled.

{¶ 42} Assignment of Error No. 3:

{¶ 43} THE TRIAL COURT'S JUDGMENT GRANTING PERMANENT CUSTODY OF K.M. TO BUTLER COUNTY CHILDREN SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, CONTRARY TO LAW, NOT SUPPORTED BY SUFFICIENT CLEAR AND CONVINCING EVIDENCE, AN ABUSE OF DISCRETION, AND CONTRARY TO THE BEST INTEREST OF THE CHILD.

{¶ 44} In his third assignment of error, Father argues the juvenile court's decision to grant BCCS's motion for permanent custody was contrary to law, an abuse of discretion, not supported by sufficient evidence and against the manifest weight of the evidence. We disagree.

<u>Permanent Custody Standard of Review</u>

{¶ 45} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent custody only

- 15 -

if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 46} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

Two-Part Permanent Custody Test

{¶ 47} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C.

2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21.

Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of

the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has

been in the temporary custody of the agency for at least 12 months of a consecutive 22-

month period; (4) where the preceding three factors do not apply, the child cannot be placed

with either parent within a reasonable time or should not be placed with either parent; or (5)

the child or another child in the custody of the parent from whose custody the child has

been removed, has been adjudicated an abused, neglected, or dependent child on three

separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709,

¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part

permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-

3188, ¶ 12.

12 Months of a Consecutive 22-Month Period

{¶ 48} As it relates to the second part of the two-part permanent custody test, the

juvenile court found K.M. had been in the temporary custody of BCCS for at least 12 months

of a consecutive 22-month period. Father does not dispute this finding.

Best Interest of the Child

{¶ 49} Turning now to the first part of the two-part permanent custody test, the

juvenile court found it was in K.M.'s best interest to grant BCCS's motion for permanent

custody. Unlike the juvenile court's 12-of-22 month finding, Father disputes this finding by

arguing the juvenile court's decision was not supported by sufficient evidence and was

against the manifest weight of the evidence. We find no merit to Father's claims.

{¶ 50} Similar to the best interest analysis under R.C. 3109.04(F), the juvenile court

is required to consider certain enumerated factors under R.C. 2151.414(D)(1) when

considering the best interest of a child in a permanent custody case. *In re D.E.,* 2018-Ohio-

- 17 -

3341 at ¶ 32. These factors include, but are not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24, citing *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

Juvenile Court's Best Interest Findings

{¶ 51} Initially, with respect to K.M.'s relevant interactions and relationships with those who may significantly impact her young life, the juvenile court found Mother had not been involved with the case "for some time" and had abandoned K.M. Similarly, as it relates to Father, the juvenile court found Father had at that time "no present relationship" with K.M. because Father had delayed his participation in the case "for reasons that are not entirely clear." According to the juvenile court, Father's delayed participation was likely due to his misguided belief that Mother was working towards reunification with K.M. by having the child returned to her care. The juvenile court also found Father's delayed participation may have been the result of "concerns about the viability of any request for custody on his part due to his criminal record."

{¶ 52} Regardless of the reasons for Father's delayed participation in the case, once Father became involved the juvenile court put an order in place that would have allowed Father supervised visitation time with K.M. upon successfully completing a sexual offender assessment and engaging in case plan services. This included Father participating in mental health counseling. Father, however, never completed the sexual offender assessment "and did not participate in counseling (and other services), therefore, his visits never commenced." The sexual offender assessment was crucial due to Father's prior conviction for rape of a thirteen-year-old child.

{¶ 53} In regard to Aunt and Uncle, the juvenile court noted that a home study of Aunt and Uncle's home was approved and that weekly supervised visitation time was ultimately awarded. During these supervised visits, the juvenile court found the visits "went well." The juvenile court also found that Aunt and Uncle were "patient, loving, and appropriate during all of the visits." However, while attending most of their supervised visitation time with K.M., the juvenile court noted that Aunt and Uncle "cancelled a visit and missed, for reasons that are in dispute, the next visit." Per policy, this resulted in Aunt and Uncle's supervised visitation time being suspended. Once suspended, the juvenile court noted that Aunt and Uncle "took no action to ascertain how those visits could be reinstated."

{¶ 54} The juvenile court also found K.M. had been in her current foster home for a "significant period of time." This was the same foster home where K.M.'s sister, A.M., was also placed after she too was removed from Mother's care. The juvenile court also found K.M. had developed a "significant bond" with her foster parents as well as with other members of her foster family. This, as noted above, includes K.M. referring to her foster parents as "Mommy" and "Daddy." This bond has resulted in K.M.'s foster parents taking steps to adopt A.M. and expressing an interest in also adopting K.M. The juvenile court further noted that K.M. attends preschool and is involved in therapy to address "trauma

related issues." Even though she is involved in therapy, the juvenile court found K.M. was "described by all reports as a happy child."

{¶ 55} Next, regarding K.M.'s wishes, the juvenile court relied on the guardian ad litem's report and recommendation that permanent custody should be granted to BCCS. As part of that report and recommendation, the guardian ad litem stated:

> [K.M.] is thriving in her current foster home that she shared with her little biological sister. She has had all her basic and special needs met. She is now up to date on her shots (she was behind when she entered foster care). She has participated in speech therapy and individual therapy and TIP and daycare. [K.M.'s] foster parents have committed themselves to caring for [K.M.] and her sibling, including a willingness to adopt both children. [K.M.] is very bonded to her foster parents and looks to them for all her needs to be met. She calls them Mommy and Daddy and has since [being] placed in the home. She is affectionate and active in their home and appears quite comfortable. She is an amazing, sweet, polite, energetic, beautiful, and kind child. She was so excited when this GAL saw her in HER house. She has such a close bond in her home with her sibling and the foster parents as well as her school, daycare and such, that to remove her from her home would likely traumatize this child.

{¶ 56} With respect to K.M.'s custodial history, the juvenile court found K.M. had been in the temporary custody of BCCS for 12 months of a consecutive 22-month period. As noted above, Father does not dispute this finding.

{¶ 57} Furthermore, when considering K.M.'s need for a legally secure permanent placement, the juvenile court found K.M. had been in several different placements following her removal from Mother's care. Due to this uncertainty, the juvenile court noted that "[t]he time has come to assure that wherever she goes, the placement is permanent." However, the juvenile court found that neither Mother nor Father were viable options for placement of the child. In so holding, the juvenile court reiterated its previous findings that Mother had not been involved in this case for "a long time." This, as the juvenile court noted, resulted in Mother abandoning K.M.

{¶ 58} Likewise, as it relates to Father, the juvenile court found:

> Father is also not an option. He spoke forthrightly regarding the need to look beyond the piece of paper relating to his criminal conviction. Father did make some efforts to have the court see him in a different light. He completed a SAMI assessment and completed portions of his sex offender assessment. What he did not do was follow through and complete his sex offender assessment and other recommended services. He missed many appointments regarding services, most without a reasonable excuse. He knew from the outset of his involvement that proving it would be safe to trust him with his child would be difficult. The actions he has taken since becoming involved in this case in his effort have fallen far short of this goal.

{¶ 59} Similarly, as it relates to Aunt and Uncle, the juvenile court found they too were not a viable option for placement of K.M. The juvenile court based its finding on a number of factors. For instance, the juvenile court found there were "some issues" in regard to Aunt and Uncle's home study that "impact somewhat upon its weight in terms of its ultimate conclusion." Most notable to the juvenile court was Aunt's prior history with a different children services agency. As the juvenile court found:

> [Aunt] has a history with Child Protective Services in Montgomery County. That history is somewhat dated, relating to events more than 10 years ago. The information regarding that involvement, also, almost entirely centers on [Aunt's] relationship with her former husband, * * * a relationship where he appears to be an abusive spouse. That relationship appears to have ended. It is notable, though, that one of the incidents involved [Aunt] disobeying a protective supervised visitation order.

{¶ 60} Despite the issues with their home study, the juvenile court nevertheless found that Aunt and Uncle "seem to be quite honest, generous, altruistic, and kind." The juvenile court also noted that Aunt was a foster child herself and that she "testified movingly about the importance of family." The juvenile court further noted that Aunt and Uncle were "very appropriate and loving" when interacting with K.M. and that their home appeared to be appropriate and safe to raise K.M. But, even then, the juvenile court found placing K.M.

with Aunt and Uncle "would possibly, if not probably, be traumatic for [K.M.]" As the juvenile court stated:

> [K.M.'s] foster home is the only secure stable home she has known having lived there the last third of her young life. Although [Aunt] speaks of now being the time to make a placement change because of [K.M.'s] age, that ignores two facts. First, [K.M.] is already in trauma informed therapy. Second, four placement changes over five years is a significant number. It would be a gamble to try a fifth.

{¶ 61} Therefore, because K.M. was "thriving" in her foster home, the juvenile court found granting BCCS's motion for permanent custody would provide K.M. with the only available legally secure permanent placement "[a]ssuming that her foster placement is a viable adoptive home for her."

{¶ 62} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court again reiterated that Mother had abandoned K.M. The juvenile court also noted in regard to Mother:

> As set forth in the adjudicatory facts, the children were initially removed from mother's care due to concerns about lack of supervision, lack of basic care of the children regarding hygiene, and mental health problems. Although [BCCS] prepared a case plan, mother stopped her participation in the case and the case plan quite a while ago.

{¶ 63} And in regard to Father:

> As for father, he began his participation after this child had been in care for about ten months. The first goal of services was to assess what risk, if any, father would pose to his child. Case plan services included assessments, education, and counseling. Father, by his own admission, failed to follow through with those services.

<u>Best Interest Analysis</u>

{¶ 64} Considering the testimony and evidence presented, which includes a report that Father tested positive for marijuana during the pendency of this case, we find the record fully supports the juvenile court's decision finding it was in K.M.'s best interest to grant

permanent custody to BCCS. As noted above, Father disputes this finding by arguing the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. But, even then, Father readily acknowledges as part of his brief that he has "not seen K.M. since before the removal herein" and that "he is not a viable option at this time." Father also acknowledges that the juvenile court "correctly found that K.M. is in need of a legally secure permanent placement[.]" Therefore, given Father's own admissions that he is unable to properly care for K.M., the juvenile court's decision finding Father was not a viable option for placement of K.M. was proper and comports with what is in K.M.'s best interest.

{¶ 65} Acknowledging that he is not a viable option for placement, Father's argument is essentially that the juvenile court erred by granting BCCS's motion for permanent custody rather than granting legal custody to Aunt and Uncle. But, as addressed more fully above, simply because Aunt and Uncle could theoretically provide K.M. with a legally secure permanent placement does not necessarily mean that it would be in K.M.'s best interest to do so. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 2018-Ohio-3341 at ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61.

{¶ 66} The juvenile court, just like this court on appeal, must act in a manner that places K.M.'s best interest above all else. *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 54. The juvenile court's decision to grant permanent custody to BCCS does just that. *See, e.g., In re A.J.*, 2019-Ohio-593 at ¶ 43 ("simply because [appellant] may have the ability to provide for [her child] does not mean it would be in the child's best interest to be placed in [her] care"). This is because, as the juvenile court found, K.M. was "thriving" in her foster home and had exhibited a "significant bond" with her foster parents as well as with other members of her foster family. Therefore, finding no error in the juvenile

court's decision granting BCCS's motion for permanent custody, Father's third assignment of error lacks merit and is overruled.

**Conclusion**

{¶ 67} The juvenile court did not err in its decision to grant BCCS's motion for permanent custody of K.M. The record is clear that Father would have preferred the juvenile court grant legal custody to Aunt and Uncle rather than granting BCCS's motion for permanent custody. Given Aunt's testimony that K.M. "needs to be with family," the same is true for Aunt and Uncle. However, "[w]hile 'blood relationship' and 'family unity' are factors to consider when determining a child's best interest, neither one is controlling." *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 12. It is the best interest of the child, not a parent's or other family member's preferred outcome, that is controlling. Therefore, because K.M. is now thriving in a stable and secure environment under the care of her foster parents, we agree with the juvenile court's decision to grant BCCS's motion for permanent custody. Accordingly, finding no merit to any of the arguments raised herein, Father's three assignments of error are overruled and the juvenile court's decision is affirmed.

{¶ 68} Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.