[Cite as *In re L.S.*, 2019-Ohio-3143.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| L.S., et al. | : | CASE NOS. CA2019-03-001<br>CA2019-03-002 |
| | : | |
| | : | O P I N I O N<br>8/5/2019 |
| | : | |

APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20163007

Dever Law Firm, Scott A. Hoberg, 9146 Cincinnati-Columbus Road, West Chester, Ohio 45069, for appellant, Mother

Denise S. Barone, 385 North Street, Batavia, Ohio 45103, for appellant, Father

Zachary A. Corbin, Brown County Prosecuting Attorney, W. Scott Wilson, 510 East State Street, Suite 2, Georgetown, Ohio 45121, for appellee

Christine D. Tailer, P.O. Box 14, Georgetown, Ohio 45121, guardian ad litem

**S. POWELL, J.**

{¶ 1} Appellants, the mother and father of L.S. and J.S. (respectively, "Mother" and "Father"), appeal the decision of the Brown County Court of Common Pleas, Juvenile Division, granting permanent custody of their two children to appellee, Brown County Children Services ("BCCS"). For the reasons outlined below, we affirm.

**Facts and Procedural History**

{¶ 2} On February 5, 2016, BCCS filed a complaint requesting protective supervision of J.S. J.S., who was born on January 1, 2010, was five years old at the time the complaint was filed. In support of its complaint, BCCS alleged J.S. was an abused, neglected, and dependent child. These allegations arose after BCCS received a report that Mother's behaviors were "all over the place" during a telephone interview regarding her eligibility for food stamps. A subsequent investigation revealed J.S. was often absent from school and in jeopardy of truancy charges being filed against Mother and Father. The investigation also revealed that J.S. had to "sneak food into her bedroom" and was oftentimes "hungry at home." The investigation further revealed that J.S. had reported seeing "people doing drugs and putting needles in their arms." These allegations ultimately resulted in both Mother and Father testing positive for benzodiazepine, barbiturates, methamphetamine, opiates, oxazepam, phenobarbital, and suboxone.

{¶ 3} Upon receiving BCCS's complaint, the juvenile court granted interim temporary custody of J.S. to BCCS. The juvenile court also appointed J.S. with a guardian ad litem. Following her appointment, the guardian ad litem filed a report noting that she had gone to the family home and found it to be "littered with garbage and smelled of cat urine." The guardian ad litem also reported that Mother admitted to a long history of illegal drug and alcohol abuse by both herself and her family. Mother further admitted that her history of substance abuse and the pressure of BCCS's recent involvement in her and her children's lives was putting her in danger of relapsing. The guardian ad litem additionally noted that Mother had agreed that J.S. should be placed in the temporary custody of BCCS "as long as she would be able to have ample visitation with her child."

{¶ 4} Upon receiving the guardian ad litem's report, the juvenile court granted both

Mother and Father weekly supervised visitation time with J.S. Shortly thereafter, on March 15, 2016, the magistrate issued an order that found Mother's supervised visitation time had been revoked due to her again testing positive for opiates.[1] A case plan was then established that required both Mother and Father to complete a mental health evaluation, a drug and alcohol assessment, parenting and anger management classes, as well as comply with all scheduled and random drug screens. Mother and Father were also ordered to obtain both safe and stable housing, employment, and income to meet J.S.'s basic needs. Although likely unknowingly, the record indicates Mother was at that time approximately one month pregnant with L.S.

{¶ 5} On May 9, 2016, BCCS filed an amended complaint requesting it be granted temporary custody of J.S. rather than merely protective supervision Two days later, the magistrate held a review hearing on the matter. Neither Mother nor Father appeared at this hearing. However, while not appearing at this hearing, evidence was presented indicating that Father had been attending his supervised visitation time with J.S. Evidence was also presented that indicated Father had begun substance abuse treatment and anger management classes. But, as it relates to Mother, the record indicated Mother had not had any visitation time with J.S. for nearly six weeks. The record also indicated Mother had not yet begun any of the services set forth in her case plan. This includes both mental health and substance abuse treatment.

{¶ 6} On July 8, 2016, the magistrate issued an order that instructed BCCS to file another amended complaint to accurately reflect J.S.'s name. The magistrate also ordered

---

1. The magistrate also found that a prior visit between Mother and J.S. was had been terminated after BCCS smelled the odor of alcoholic beverages on Mother's breath. When confronted about the smell, the record indicates Mother admitted that she had drank the night before to the point of blacking out. The magistrate found yet another visit between Mother and J.S. had been terminated due to BCCS's belief that Mother was attempting to "dilute" the urine sample she provided for a drug screen.

BCCS to modify Father's weekly supervised visitation time so that his visitation time with J.S. did not interfere with his case plan services. However, although his visitation time was later modified to better accommodate his schedule, Father's visitation time was nevertheless revoked after Father did not appear for three consecutive visits. As for Mother, the magistrate found Mother was then incarcerated in a local jail on charges alleging she had committed forgery and theft, both fifth-degree felonies. Mother was ultimately convicted of both charges and sentenced to 20 months in prison.

{¶ 7} On August 29, 2016, the magistrate issued a dispositional decision granting temporary custody of J.S. to BCCS. The magistrate reached this decision upon finding J.S. was an abused, neglected, and dependent child. Approximately three months later, on November 23, 2016, Mother gave birth to L.S. while in prison.[2] That same day, BCCS filed a complaint requesting temporary custody of L.S. In support of its complaint, BCCS alleged L.S. was also an abused, neglected, and dependent child. BCCS supported these allegations by arguing Mother could not provide the necessary care for L.S. due to her current incarceration, whereas Father could not provide care for L.S. because his whereabouts were then unknown. Upon receiving BCCS's complaint, the juvenile court granted interim temporary custody of L.S. to BCCS. The juvenile court also appointed L.S. with a guardian ad litem.

{¶ 8} On January 3, 2017, BCCS moved the juvenile court to grant legal custody of J.S. to her maternal aunt and uncle.[3] Prior to the filing of that motion, J.S. had been in her aunt and uncle's care for approximately three months and was, at that time, reportedly

---

2. L.S. was born three weeks premature and addicted to drugs due to Mother's illegal drug use while she was pregnant with him.

3. J.S.'s aunt and uncle were also identified in the record as J.S.'s maternal cousins. This court will refer to them as J.S.'s aunt and uncle for purposes of consistency.

"doing well." BCCS supported its motion by noting that Mother was still incarcerated and that, even before being sent to prison, Mother had not engaged in any of the necessary case plan services set forth in her case plan. BCCS also noted that Father, who already had two of his other children removed from his care, was awaiting trial on a charge of misdemeanor assault.[4] BCCS further noted that Father had not "been cooperative with the agency." This included Father refusing to take at least one drug screen.

{¶ 9} On January 17, 2017, the magistrate issued a dispositional decision granting temporary custody of L.S. to BCCS upon finding L.S. was also an abused, neglected, and dependent child. Approximately three months later, BCCS moved to withdraw its motion requesting legal custody of J.S. be awarded to aunt and uncle. The record indicates BCCS moved to withdraw its motion after it received reports that J.S. had lost 15 pounds in just a matter of weeks while under aunt and uncle's care. BCCS had also received reports that J.S. had suffered "emotional abuse and medical abuse" while living in aunt and uncle's home. This included an assessment that found J.S. suffered from "excessive brain washing." Upon receiving these reports, BCCS removed J.S. from her aunt and uncle's home and placed her in a foster home. There is no dispute that the foster home where J.S. was placed was the same foster home where L.S. was placed shortly after his birth.

{¶ 10} On May 15, 2017, the magistrate held another review hearing. Following this hearing, the magistrate issued an order finding J.S. had been removed from her aunt and uncle's care after BCCS received reports that they were telling J.S. "horrible things about her parents." This included a finding that aunt and uncle had told J.S. "that her parents chose drugs over her." This, according to the magistrate, caused J.S. to suffer additional

---

4. The record indicates Father was convicted of the assault offense and placed on probation. Father's probation was thereafter revoked, which resulted in Father being sentenced to serve ten days in jail. The record also indicates Father had an earlier conviction for a felony aggravated assault that resulted in him serving 80 days in prison and being placed on two years of probation.

serious mental health issues. The magistrate also found J.S.'s aunt and uncle had placed J.S. on several drugs without BCCS's knowledge or consent; namely, concentra, ritalin, and clonidine. The magistrate further found that while Father had completed his substance abuse treatment, Father did not have any follow-up treatment, did not have a sponsor, and did not have a sobriety support system. The magistrate additionally found that Father did not have any employment, income, or independent housing.

{¶ 11} On May 18, 2017, BCCS moved for permanent custody of both J.S. and L.S. In support of its motion, BCCS again noted that Mother had not completed any of the required case plan services prior to being sent to prison. On the other hand, as it relates to Father, BCCS noted that Father had completed drug treatment and anger management classes. Father, however, had not completed the required parenting classes nor had Father obtained safe and stable housing, employment, or income. BCCS further noted that J.S. had been in several placements following her removal from Mother and Father's care. This included J.S.'s placement with her aunt and uncle that resulted in "allegations of neglect that were substantiated." BCCS additionally noted that J.S. had "expressed to the agency that she would like to live at her foster home" and visit with Mother and Father only "sometimes."

{¶ 12} On July 10, 2017, the magistrate held an annual review hearing. Following this hearing, the magistrate issued an order finding that J.S. was progressing in her current foster home. However, although J.S. was progressing in foster care, the magistrate found J.S. was nevertheless being enrolled in a weekly trauma-based program in order to address her diagnosed post-traumatic stress disorder, nightmares, and self-harm.[5] The magistrate

---

5. In addition to being diagnosed with post-traumatic stress disorder, nightmares, and self-harm, J.S. was also diagnosed with depression and anxiety. J.S.'s significant mental health issues have resulted in her going into a "manic state," causing her to see hallucinations, and to bite herself. These issues were attributed to her past abuse and memories of her earlier childhood while in the custody and care of Mother and Father. These

also found J.S. was attending a private tutor due to her being "woefully behind educationally." Additionally, as it relates to L.S., the magistrate found L.S. had a "tremendous amount of medical issues" as a result of Mother using illegal drugs and alcohol while she was pregnant with him. This required L.S. to attend neonatal and gastrointestinal clinics, see a neurologist, and engage in weekly physical and occupational therapy sessions.

{¶ 13} On October 27 and November 26, 2017, a two-day hearing was held on BCCS's motion for permanent custody. Because she was still incarcerated, Mother was able to attend only the second day of the two-day permanent custody hearing. Father, however, appeared for both days of the permanent custody hearing.[6] During this hearing, the magistrate heard testimony from the caseworker then assigned to the case, the children's foster mother, the children's guardian ad litem, and a counselor who had previously met with J.S. The magistrate also heard testimony from both Mother and Father.

{¶ 14} As part of this testimony, the guardian ad litem testified that she believed granting BCCS's motion for permanent custody was in the children's best interest for "many, many reasons." Specifically, the guardian ad litem testified:

> Parents have not completed so many of their case plan services. Father may have done the drug and alcohol counseling, but has continued to test positive. Mother may have done parenting classes in prison, but hasn't had any relationship with her children now in a substantial period of time. * * * [T]here is still so many aspects of the case plan that parents simply have not done. They may have done a few, but income, stable housing, mental health assessment are to name just a few of the things that they've not done.

---

memories also manifested themselves in nightmares where J.S. dreamed that Father was going to find her, kidnap her from her foster home, and hurt her.

6. Although they appeared during the second day of the two-day hearing, both Mother and Father arrived late after the hearing had already begun.

The guardian ad litem also testified that J.S. – who the guardian ad litem described as a "severely disturbed child" – had expressed "very intensely not wanting to return to Mother and Father."

{¶ 15} On April 10, 2018, the magistrate issued a decision granting BCCS's motion for permanent custody of both J.S. and L.S. Both Mother and Father filed objections to the magistrate's decision. However, after several delays, the juvenile court issued a decision overruling Mother's and Father's objections. In so holding, the juvenile court found the magistrate's decision was "legally sound." The juvenile court also found the magistrate's decision was supported by "ample" evidence that clearly established that it was in J.S.'s and L.S.'s best interest to grant permanent custody to BCCS.

**Appeal**

{¶ 16} Mother and Father now appeal the juvenile court's decision, collectively raising two assignments of error for review. In their two assignments of error, Mother and Father both argue the juvenile court's decision to grant BCCS's motion for permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

<u>Permanent Custody Standard of Review</u>

{¶ 17} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In*

*re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.

This court will therefore reverse a juvenile court's decision to grant permanent custody only

if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No.

CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is

supported by sufficient evidence, "an appellate court may nevertheless conclude that the

judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No.

CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 18} As with all challenges to the manifest weight of the evidence, in determining

whether a juvenile court's decision is against the manifest weight of the evidence in a

permanent custody case, an appellate court "'weighs the evidence and all reasonable

inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest

miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re

S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095

thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d

328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the

finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist.

Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶

25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing

court is bound to give it that interpretation which is consistent with the verdict and judgment,

most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

<u>Two-Part Permanent Custody Test</u>

{¶ 19} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental

rights and award permanent custody of a child to a children services agency if the court

makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

<u>Second Part of the Two-Part Permanent Custody Test</u>

{¶ 20} Despite Mother and Father's claims, there can be no dispute that J.S. had been in the temporary custody of BCCS for at least 12 months of a consecutive 22-month period at the time BCCS filed its motion for permanent custody. L.S., however, had not. Because the 12-of-22 factor did not apply to L.S., the juvenile court instead found L.S. could not be placed with either Mother or Father within a reasonable time or should not be placed with either Mother or Father. Both Mother and Father dispute the juvenile court's finding.

{¶ 21} Mother argues the juvenile court's decision was improper when considering L.S.'s significant health issues did not require "expertise" to address, "but rather mere

- 10 -

training." Because mere training was needed, Mother claims "almost anyone could parent L.S." This, according to Mother, constitutes insufficient evidence to prove that placing L.S. in her care would jeopardize his health and safety. Father similarly argues the juvenile court's decision was improper since "it was simply a matter of training" that was needed to properly care for L.S., not expertise. Therefore, according to both Mother and Father, the juvenile court's decision to grant BCCS permanent custody of L.S. was premature. We find no merit to either Mother's or Father's claims.

{¶ 22} This court does not dispute that it was theoretically possible for Mother and Father to learn how to properly care for L.S.[7] However, when considering L.S.'s significant health issues, the fact that Mother and Father had not been trained on how to properly care for L.S. was not the only obstacle either Mother or Father faced. Far from it. Mother, for instance, had just been released from prison on charges of felony forgery and theft, both of which were the direct result of Mother's continued illegal drug and alcohol use. This prevented Mother from having any contact with L.S. other than the two days following his birth. Mother had also not completed any of the required case plan services prior to going to prison, nor had Mother obtained employment, income, or housing following her release from prison.

{¶ 23} Moreover, while the record indicates Father may have completed substance abuse treatment and anger management classes, Father had not completed his parenting classes and continued to use illegal drugs and alcohol throughout the pendency of this case. While certainly concerning when taken in isolation, these issues are further

---

7. Although theoretically possible, this court has significant doubts that either Mother or Father could properly care for L.S. even if given the necessary training. This is most readily apparent with respect to L.S.'s feeding schedule and dietary needs, which involves the use of four different toys and up to three different types of food. However, even when done correctly, the record indicates L.S. still chokes and projectile vomits when offered different textured foods. This process has proved difficult even for L.S.'s foster mother, a registered pediatric nurse employed at a local children's hospital.

compounded by the fact that Mother and Father intended to maintain their relationship and live together with the children should they be returned to their care. Therefore, even when taking just these facts, we find no error in the trial court's decision finding L.S. could not be placed with either Mother or Father within a reasonable time or that L.S. should not be placed with either Mother or Father. Mother and Father's claims otherwise lack merit.

<u>First Part of the Two-Part Permanent Custody Test</u>

{¶ 24} Mother and Father also dispute the juvenile court's decision finding it was in J.S. and L.S.'s best interests to grant BCCS's motion for permanent custody. We again find no merit to either Mother's or Father's claims.

{¶ 25} When considering the best interest of a child in a permanent custody case, the juvenile court is required to consider certain enumerated factors under R.C. 2151.414(D)(1). *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24, citing *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial

court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶ 26} As noted above, Mother argues the juvenile court erred by finding it was in J.S.'s and L.S.'s best interests to grant permanent custody to BCCS. Specifically, as it relates to J.S., Mother argues that granting permanent custody was not in J.S.'s best interest when considering J.S. had not engaged in any erratic behavior or self-harm prior to being removed from her care. Mother also argues the juvenile court's decision was improper since J.S. was bonded to her and had exhibited behaviors indicating she wanted to be returned to her care rather than be subject to "a perpetuation of placement changes." Mother additionally argues that it was not in L.S.'s best interest to grant permanent custody to BCCS because "specific expertise" was not needed to address L.S.'s significant medical issues, only training. Therefore, because she was looking into obtaining housing through a local social services agency, and because she allegedly received substance abuse treatment, mental health treatment, and parenting classes while in prison, Mother argues that it was improper for the juvenile court to grant permanent custody to BCCS.

{¶ 27} Similar to Mother's arguments, Father also argues the juvenile court erred by finding it was in J.S.'s or L.S.'s best interests to grant permanent custody to BCCS. Although oftentimes difficult to decipher, Father supports his claims by alleging the juvenile court relied on testimony that was unreliable, incompetent, and in some instances inadmissible "double hearsay." Father also argues – without any supporting authority – that the juvenile court's decision was "void" since these proceedings were initiated by BCCS originally filing a complaint for protective supervision of J.S. rather than temporary custody. Father further argues the juvenile court's decision must be reversed because there was "no basis" for BCCS to move for temporary custody of L.S. immediately following his birth.

Therefore, when taking these matters into consideration, Father questions whether "any person in his or her right mind" would believe BCCS "treated this permanent custody trial with the same seriousness as if this were a capital murder case?"[8]

**{¶ 28}** As noted above, we find no merit to any of Mother's or Father's claims. Although Mother claims she is now able to maintain her sobriety, Mother admitted that she has struggled to overcome her significant substance abuse issues in the past. These issues resulted in Mother being sentenced to serve 20 months in prison on charges of felony forgery and theft. Due to her lengthy prison sentence, Mother had no contact with J.S. for many months and only limited contact with L.S. after giving birth to him while in prison. Mother also noted her intention to remain married to, and in a relationship with, Father. Father, however, had not completed his parenting classes, nor had Father obtained any employment, income, or independent housing during the pendency of this case. Father, who the caseworker described as a "safety hazard" due to his explosive behavior and threatening nature, was also still using illegal drugs and alcohol throughout the pendency of this case.

**{¶ 29}** While these issues are certainly concerning, what this court finds most troubling is the juvenile court's findings as it relates to when J.S. was still in the custody and the care of Mother and Father. This includes findings that J.S. had witnessed Father physically abusing Mother, as well as J.S. seeing her grandmother overdose on drugs. The juvenile court also found J.S. had been "beaten" by both of Mother and Father, that Mother and Father had "starved her," that J.S. was oftentimes hungry while under Mother and

---

8. Father additionally argues that his trial counsel provided ineffective assistance of counsel since "[t]he grant of permanent custody to the state was an abuse of discretion." Besides this single sentence, Father did not advance any argument to support this claim nor did Father cite to anything in the record. Considering Father did not take the time to support his argument in even the most basic of terms as required by App.R. 16(A)(7), we decline to address Father's ineffective assistance of counsel claim as permitted by App.R. 12(A)(2).

Father's care, and that Mother and Father had locked J.S. in her room when she was able to eat for "eating too much."

{¶ 30} The juvenile court further found that J.S. had witnessed her grandmother kick her mother's pregnant belly and her grandmother "hold her mother at knife point." The juvenile court additionally found that J.S. had "tearfully told her foster mother that she was scared that Father would find out where she was living and would attack her" and that J.S. was "fearful of both Mother and Father because they were 'not nice.'" This was in addition to the juvenile court's finding J.S. "felt responsible for the fact that her two year old nephew had pricked himself with a heroin needle when her parents asked [her] to watch the child, after which the child got 'really sick.'"

{¶ 31} The record also indicates J.S. told her foster mother that she hoped Mother would stay in prison "forever." This, as J.S.'s foster mother testified, was because J.S. believed Mother would have food, not do drugs, and avoid being beaten by Father while in prison. The record further indicates that J.S. reported to a counselor that she saw Mother and Father having sexual intercourse when she was three years old, that Father would "whip" her with his belt, and that she had on occasion been left at home alone unsupervised. J.S. also reported that both Mother and Father were "mean" and that they "tell all kinds of lies." J.S. additionally reported that she could not think of anything good to say about either Mother or Father and that Father "doesn't care about anything but drugs." When asked if he believed J.S. was being truthful when reporting these allegations, the counselor testified that J.S. was "very transparent about those things, yes."

{¶ 32} While Mother claims she has a bond with her children, the juvenile court also found both J.S. and L.S. were "very bonded" to their foster parents. The juvenile court further found that both J.S. and L.S. were doing well in their current foster home. The

juvenile court additionally found that J.S. was old enough to express her desire to remain in that foster home under the care of her current foster family. This was because, as noted by the juvenile court, J.S. "knew that she would always have food, would be well cared for, and would never be hurt by her parents again if she could remain in her foster home." This is significant given the children's foster mother testified that she and the children's foster father wanted to adopt both J.S. and L.S. if permanent custody was granted to BCCS.

{¶ 33} A child's best interests are best served by the child being '"placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant BCCS's motion for permanent custody does just that. This is particularly true here when considering J.S. reported to the guardian ad litem that she "never wanted to see her parents again." It is the best interest of the child, not a parent's preferred outcome, that is controlling. *In re K.M.*, 12th Dist. Butler No. CA2019-01-015, 2019-Ohio-1833, ¶ 67. Therefore, finding no error in the juvenile court's decision, Mother's and Father's single assignments of error lack merit and are overruled.

**Conclusion**

{¶ 34} Given the significant hurdles that both Mother and Father face in order to establish a secure, stable, and drug-free environment for both themselves and the children, the juvenile court did not err by granting BCCS's motion for permanent custody of J.S. and L.S. In so holding, we note that when asked by the magistrate how she was going to be able to focus on her sobriety, obtain employment, find suitable housing, and find time to properly care for both J.S. and L.S. given their significant health issues, Mother testified "I have no idea." A parent is afforded a reasonable, not an indefinite, period of time to remedy

the conditions causing the children's removal. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 23. Therefore, finding no merit to any of the arguments raised herein, Mother's and Father's single assignments of error are overruled and the juvenile court's permanent custody determination is affirmed.

{¶ 35} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.