[Cite as *In re G.M.*, 2022-Ohio-3687.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| G.M., et al. | : | CASE NO. CA2022-05-053 |
| | : | O P I N I O N<br>10/17/2022 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2019-0237, JN2019-0239, JN2019-0240, and JN2020-0142

Michael T. Gmoser, Butler County Prosecuting Attorney, and Willa Concannon, Assistant Prosecuting Attorney, for appellee.

Garrett Law Offices, and Dawn S. Garrett, for appellant.

Legal Aid Society of Southwest, Ohio, LLC, and Jamie Landvatter, Guardian ad Litem.

**HENDRICKSON, J.**

{¶1} Appellant, the mother of the four minor children in this case ("Mother"), appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to Butler County Department of Job and Family Services, Children's Services Division ("the Agency"). For the reasons that follow, we affirm the

decision of the juvenile court.

{¶2} The three oldest children came to the attention of the Agency in March of 2019, shortly after Mother gave birth to twin girls J.M. and M.M. Just after her birth, J.M. stopped breathing and required the placement of an NG tube for feeding. As a result, J.M. required continued hospitalization. Hospital staff observed Mother co-sleeping with M.M. while visiting with J.M. in the hospital, and advised Mother that co-sleeping was considered a safety concern. Hospital staff requested Mother not to bring M.M. if she would be sleeping while at the hospital, which resulted in Mother rarely visiting J.M. Due to the infrequent visitation, hospital staff reported to the Agency that "the visits and demonstration of care were not consistent enough for progress to be made."

{¶3} In addition to Mother's care and visitation of J.M., the Agency had concerns regarding ongoing domestic violence between Mother and the children's father ("Father").[1] In April 2019, Mother and the children moved in with maternal grandmother due to the domestic violence between Mother and Father and the "deplorable condition" of their home at that time. Approximately two weeks later, maternal grandmother kicked Mother and the children out of her home, and they returned to live with Father.

{¶4} In May 2019, shortly after Mother and the children resumed living with Father, the Agency filed a complaint alleging that the three children, G.M., M.M., and J.M., were dependent based upon the above facts and that G.M. was behind on her immunizations. After a hearing, the children were removed from the home and placed in the temporary custody of the Agency.

{¶5} On July 19, 2019, G.M., M.M., and J.M. were adjudicated dependent and were

---

1. Father is the biological father of the four children involved in this case. Father was involved in case plan services initially, but later executed a surrender of his parental rights in favor of the Agency. As such, Father did not appeal from the juvenile court's decision and was not involved in these proceedings.

placed together in the same foster home. A case plan was created for Mother with the goal of reunification. Among other things, the case plan required Mother to engage in a domestic violence assessment and establish a safe environment for herself and her children; maintain and monitor her sobriety; and to obtain employment and stable housing. The case plan was later amended to require a psychological evaluation and a parenting education program. Mother was also referred to substance abuse services after testing positive for methamphetamine and alcohol.

{¶6} The following year, in June 2020, Mother gave birth to the youngest child, E.M. The day after E.M.'s birth, the Agency received a neglect and physical abuse allegation regarding the child. Hospital staff reported that Mother and Father spent most of their time at the hospital verbally assaulting each other, which interfered with Mother's ability to feed E.M. There was one incident where hospital staff contacted security due to Father's anger. The Agency also learned that Mother did not receive adequate prenatal care while pregnant with E.M., and that the nurses had to educate Mother "several times on safe sleep" after discovering Mother sleeping with the child while breastfeeding. Hospital staff further informed the Agency they were concerned because Mother showed a lack of caring for her child's needs. Based on the above, the Agency filed a complaint alleging that E.M. was dependent.

{¶7} The Agency obtained temporary custody of E.M., and the child was placed in the foster home with his siblings. Thereafter, E.M. was adjudicated dependent and the child was added to Mother's existing case plan with a goal of reunification.

{¶8} Over the following year, Mother made some progress in her case plan. However, despite completing some of the required case plan services, Mother failed to demonstrate any long-term employment, had difficulty maintaining suitable housing, and continued to engage in an on-again-off-again relationship with Father.

{¶9} On April 12, 2021, the Agency moved for permanent custody of G.M., M.M., and J.M. A few months later, on July 22, 2021, the Agency moved for permanent custody of E.M. A hearing on the motions was held before a magistrate in November 2021. Mother, Mother's therapist, and the caseworker handling the children's case testified. Father did not participate in the hearing, as he had previously agreed that awarding permanent custody to the Agency was in his children's best interest and had executed a surrender of his parental rights in favor of the Agency. The children's guardian ad litem ("GAL") also did not testify, but engaged in cross-examination of the witnesses and filed a report with the juvenile court recommending that permanent custody be granted to the Agency.

{¶10} On January 6, 2022, the magistrate issued a decision granting permanent custody of the children to the Agency. In analyzing the best interest factors, the magistrate found that, although Mother clearly loves her children, the children consider the foster parents to be their parents. Mother was consistent in her visitation with the children, however, her visits remained supervised at the highest level due to her struggles in appropriately caring for the children in terms of structure and discipline. With the exception of G.M., the oldest child, Mother does not appear to have a close relationship with the children.

{¶11} The magistrate further found that the barriers preventing placement in Mother's care have largely remained the same throughout the case, including her housing instability, association with partners who are potentially abusive, mental health concerns, and insufficient or unstable income. The magistrate detailed Mother's inability to address a majority of those concerns, including continuing to engage in relationships with controlling men and making little progress regarding her mental health condition and diagnoses of schizophrenia and post-traumatic stress disorder. The magistrate also noted the concerning nature of Mother's housing situation, and found that, since the children's

removal in 2019, Mother had never been able to obtain and maintain a residence that would be appropriate for her and the children. At the time of the hearing, Mother admitted she did not have an appropriate place for the children to reside, and indicated she was residing with friends at that time. Thus, the magistrate concluded granting permanent custody to the Agency was in the children's best interest.

{¶12} Mother objected to the magistrate's decision, arguing that she had remedied the issues initiating the case, and therefore, custody should have been granted to Mother. After a hearing, the juvenile court overruled Mother's objections and adopted the magistrate's decision in its entirety.

{¶13} Mother now appeals, raising the following assignment of error for our review:

{¶14} THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY OF THE CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE AS THE EVIDENCE DOES NOT SHOW THAT PLACING THE CHILDREN IN THE AGENCY'S PERMANENT CUSTODY IS IN ANY OF THE CHILDREN'S BEST INTERESTS.

{¶15} Mother argues that the juvenile court erred by granting permanent custody of the children to the Agency.

{¶16} Before a parent's constitutionally protected liberty interest in the care and custody of their children may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This

court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶17} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25, citing *Eastley* at ¶ 21.

{¶18} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent

custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶19} In this case, the juvenile court found the children had been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period at the time the Agency filed its motions for permanent custody. This finding is not disputed by Mother and is supported by the record, as G.M., M.M., and J.M. have been in the temporary custody of the Agency since July 2019 and the Agency moved for permanent custody of the children in April 2021. E.M., on the other hand, has been in the temporary custody of the Agency since July 21, 2020, and the Agency moved for permanent custody of the child on July 22, 2021. Instead, Mother disputes the juvenile court's decision finding that permanent custody of the children to the agency was in the children's best interest.

{¶20} In determining whether permanent custody is in a child's best interest, R.C. 2151.414(D)(1) requires a court to consider the following five factors:

(a) The interaction and interrelationship of the child with the

child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]

(e) Whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

"The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24.

{¶21} Based upon its consideration of the R.C. 2151.414 factors, the juvenile court found by clear and convincing evidence that it was in the children's best interest to grant permanent custody to the Agency. On appeal, Mother argues the juvenile court's finding is against the manifest weight of the evidence, and is not supported by clear and convincing evidence, because the evidence established that an award of permanent custody to the agency was not in the best interest of the children. Essentially, Mother claims an award of permanent custody was unnecessary, as she had made sufficient progress in her case plan services, had obtained employment, was working on housing, had addressed her mental health issues, and wished to reunify with her children.

{¶22} After our review of the entire record, we find no merit to Mother's claims. The

evidence and testimony presented at the permanent custody hearing revealed that Mother made some progress on her case plan services, but overall failed to remedy the Agency's primary concerns throughout the case. Regarding her mental health, the record reflects Mother's mental health condition remained largely unaddressed at the time of the hearing. Specifically, Mother received a psychological assessment with Children's Diagnostic Center ("CDC") in November 2019. During that assessment Mother stated, among other things, that she felt the presence of demons, that the demons had threatened to harm her and her children, that she had the power of telekinesis, and that she was being electronically surveilled by the government. As a result of the assessment, Mother was diagnosed with schizophrenia; alcohol use disorder, mild; cannabis use disorder, mild; and stimulant use disorder, mild. Mother disagreed with the schizophrenia diagnosis but began counseling services through CDC in February 2020. Mother was also prescribed medication to manage her mental health diagnoses, which she eventually discontinued because she did not like the side effects.

{¶23} In February 2021, after her therapist left CDC, Mother terminated her services and began services at Butler Behavioral Health ("BBH") without a referral from the Agency. Mother's therapist from BBH testified at the hearing and indicated Mother had attended weekly sessions with him for approximately eight months, although there were weeks where she did not attend. Mother's therapist explained that Mother's main diagnosis from BBH was post-traumatic stress disorder. Like her schizophrenia diagnosis from CDC, Mother disagreed with her post-traumatic stress disorder diagnosis. As a result, most of her treatment and progress at BBH related to the external factors of this case, rather than addressing her diagnosis. Mother's prior schizophrenia diagnosis was not discussed during her treatment with BBH, as her therapist was unaware that Mother completed a psychological evaluation with CDC prior to beginning services at BBH and her history of

mental health services was not brought up during their sessions. Although the therapist stated he did not identify any indications of schizophrenic behavior by Mother in their sessions, he agreed that some of the statements Mother made during her evaluation with CDC coincided with either paranoid schizophrenic thinking or methamphetamine use.

{¶24} Notably, after reviewing Mother's treatment plan with BBH, the children's caseworker testified that the Agency remained concerned regarding Mother's mental health. Specifically, the caseworker stated Mother had not addressed the Agency's concerns regarding her initial psychological evaluation with CDC. Thus, although it is evident that Mother received a psychological evaluation and has engaged in counseling since February 2020, as required by her case plan, she has not remedied the Agency's concerns regarding her mental health. That is, Mother has declined to acknowledge her counselors' diagnoses and most of her recent time in counseling was focused on Mother's setbacks in this case. Such counseling, while certainly helpful for Mother, is not indicative of addressing the Agency's concerns regarding Mother's schizophrenia diagnosis or the troubling comments she made during her initial evaluation with CDC.

{¶25} Additionally, despite maintaining various forms of employment throughout the case, Mother had not obtained stable housing by the time of the permanent custody hearing. Since the older children's removal in May 2019, Mother had lived with various family members, in Father's work truck, with friends, in various hotels, and a three-bedroom apartment for a short time. Two months prior to the hearing, Mother reported searching for a residence with her then-paramour, Andrew, but indicated they were sleeping in a van and in a tent in the meantime. At the time of the hearing, Mother still did not have independent housing, and was residing at a homeless shelter. Despite Mother's testimony that she planned to obtain housing within a few weeks of the hearing, the record does not reflect an ability to do so. Rather, at the time of the hearing, Mother indicated the homeless shelter,

which does not accept children, was her "best option," as she was unemployed at the time of the hearing, without independent transportation, and did not have sufficient income to pay for housing. Accordingly, the record is replete with examples of Mother's inability to maintain stable or suitable housing throughout the case.

{¶26} The record also reflects Mother failed to remedy the Agency's concerns regarding domestic violence. Mother testified that she was referred to and completed 25 sessions with New Perspectives Domestic Violence Group. However, simply because Mother completed a domestic violence assessment in accordance with the case plan does not necessitate a finding that Mother remedied the Agency's concerns regarding domestic violence. Rather, it is well established that "the completion of case plan services alone does not equate to, or necessitate, a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶27} In this case, the record reflects that during her entire time with New Perspectives, Mother remained in a romantic relationship with Father despite reporting that he remained abusive and controlling. Shortly after terminating her relationship with Father, Mother began a romantic relationship with Andrew, who also demonstrated controlling and manipulative behavior towards Mother. In July 2021, Mother was charged with domestic violence after an encounter with Andrew where he blocked Mother's exit from a room, and Mother threatened him with a hammer. Mother pled guilty to disorderly conduct as a result

of that incident.

**{¶28}** At the hearing, Mother acknowledged that Andrew demonstrated some controlling behaviors that she considered "red flags," but testified she was still seeking housing, employment, and transportation with Andrew at the time of the hearing. The caseworker explained it was concerning that Mother remained in a relationship with Andrew, despite his controlling behavior and the recent domestic violence incident. Accordingly, notwithstanding Mother's completion of the domestic violence assessment and the subsequent group sessions, the record demonstrates Mother continues to engage in unsafe and tumultuous relationships.

**{¶29}** Like her domestic violence assessment, Mother also completed the required parenting classes. However, due to her poor rating for participation and attitude during the classes, the Agency remained concerned regarding her ability to parent the children. According to the caseworker, Mother was not able to grasp the lessons and did not demonstrate any improvement in her parenting skills during her visitation with the children. In fact, despite consistently attending weekly visitation since the children's removal, Mother's visitation with the children never progressed beyond the most restrictive level due to her inability to meet the criteria for visitation at the next level. As a result, the caseworker remained concerned regarding Mother's ability to meet the children's needs at the time of the permanent custody hearing.

**{¶30}** The caseworker observed Mother during visitation with the children and testified Mother failed to demonstrate an ability to care for the children. Specifically, the caseworker explained that Mother lacks an ability to focus and care for all the children's needs at one time. The visitation center expressed similar concerns regarding Mother's ability to meet the children's needs, and Mother herself acknowledged at the hearing that she did not have the resources to provide for the children's needs if they were placed in her

custody that day. As such, and despite her participation in parenting classes, the record does not reflect Mother remedied the Agency's concerns regarding her ability to adequately care for or parent the children.

{¶31} Although Mother expressed a desire to reunify with the children, her failure to make progress on the case plan, to remedy the conditions that led to the children's removal, and overall inability to demonstrate the ability to care for the children, evidences her lack of commitment to the children. As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035, CA2018-04-038, 2018-Ohio-3341, ¶ 60. According to Mother's own testimony, she cannot provide such an environment for the children until she "fixes her situation," which includes obtaining housing, employment, and transportation. While this court acknowledges that Mother believes she can eventually provide adequate care for her children, "a parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the children's removal." *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 43.

{¶32} Despite the Agency's involvement for more than two years, Mother has simply been unable to remedy the conditions that caused the children's removal or demonstrate an ability to provide the stability and security the children need. Mother was given many opportunities to regain custody of her children, but she failed to take advantage of them. The children are in need of a legally secure placement, and it is evident Mother cannot provide such an environment for the children within a reasonable time. The children have spent a majority of their lives, and in E.M.'s case, all of his life, in the Agency's custody, and the record reflects the children have gained the safety and stability they need since being

placed in their foster home. The children are thriving together in their foster placement and are bonded with their foster family. Notably, due to the strong bond the children have with their foster parents, paternal grandparents and a great uncle withdrew their requests for placement of the children prior to the permanent custody hearing.

{¶33} When considering the evidence in the record, it is clear that the juvenile court's decision reflects the concern that these children were in need of safety and stability, which could not be achieved absent the grant of permanent custody. In light of the foregoing, we conclude that it is in the best interest of the children for permanent custody to be awarded to the Agency. As such, we find the juvenile court's decision to grant permanent custody of G.M., M.M., J.M., and E.M. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

{¶34} Mother's sole assignment of error is overruled.

{¶35} Judgment affirmed.

M. POWELL, P.J., and BYRNE, J., concur.